# EXHIBIT 2

ORIGINAL
FILED

1

2 ~~SEALED BY ORDER~~

3 ~~OF COURT~~

4

JAN 1 4 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5

6 IN THE UNITED STATES DISTRICT COURT

7 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10 RAHINAH IBRAHIM,                          No. C 06-00545 WHA

11          Plaintiff,                      ~~UNDER SEAL~~

12     v.                                   **FINDINGS OF FACT,**
                                            **CONCLUSIONS OF LAW, AND**
13 DEPARTMENT OF HOMELAND                   **ORDER FOR RELIEF**
   SECURITY, et al.,
14

15          Defendants.
   _____/
16

17                        **INTRODUCTION**

18       In this terrorist-watchlist challenge, a nonimmigrant alien seeks relief after having been

19 barred airplane-boarding privileges and after having been denied a visa to return to the United

20 States.  This order includes the findings of fact and conclusions of law following a five-day bench

21 trial.  Some but not all of the relief sought is granted.

22                     **PROCEDURAL HISTORY**

23       Plaintiff Dr. Rahinah Ibrahim is Muslim and a subject of Malaysia.  Pursuant to a student

24 visa, she was admitted to the United States to study at Stanford University.  On January 2, 2005,

25 plaintiff attempted to fly from the San Francisco airport to Hawaii but was handcuffed and led

26 away because she was on a federal no-fly list.  After being held, she was eventually (the next day)

27 allowed to fly to Hawaii and then back to Los Angeles and then to Malaysia.  While she was in

28 Malaysia, her student visa was revoked.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In January 2006, plaintiff commenced this civil action against multiple state and federal
2    agencies alleging Section 1983 claims, state law tort claims, and several constitutional claims
3    based on the inclusion of her name on government terrorist watchlists.  The complaint sought
4    damages and equitable relief.  An August 2006 order dismissed her claims against the federal
5    defendants based on lack of subject-matter jurisdiction because the no-fly list was an order of the
6    Transportation Security Administration under 49 U.S.C. 46110(a), which granted exclusive
7    subject-matter jurisdiction to the federal courts of appeals for review of orders of the TSA (Dkt.
8    No. 101).  The order also dismissed plaintiff's claims against a TSA employee, the airline, and the
9    federal agency defendants.

10    Our court of appeals affirmed in part, reversed in part, and remanded, holding that the
11    district court had original subject-matter jurisdiction over her claim for injunctive relief regarding
12    placement of her name on the no-fly list.  The court of appeals agreed that the district court,
13    however, lacked subject-matter jurisdiction over her claim for injunctive relief regarding the
14    government's policies and procedures implementing the no-fly list, that the federal agency and
15    airline actions were not state actions under Section 1983, and that the tort claims against the
16    federal officials in their official capacities and airline defendants were precluded.  Our court of
17    appeals further held that specific jurisdiction was available for the claims against the TSA
18    employee, who was sued in his individual capacity.  Although the government urged the appellate
19    court to find no standing, it expressly asked the district court to rule on that issue first.  *Ibrahim v.*
20    *Dep't of Homeland Sec.*, 538 F.3d 1250, 1254–56 n.9 (9th Cir. 2008)("*Ibrahim I*").

21    On remand, plaintiff filed a second amended complaint.  The operative second amended
22    complaint sought, among other things, limited relief relevant to plaintiff's visa situation but
23    stopped short of attempting to force the government to issue her a visa.  Cash settlements
24    eventually reduced the question to prospective relief only.  A motion to dismiss for lack of
25    standing was made.  In granting it, the district court drew a distinction between damages claims
26    for past injury while plaintiff had been in the United States (settled) versus prospective relief
27    sought *after* plaintiff had voluntarily left the United States (not settled).  The July 2009 order held
28    that while plaintiff could seek damages for her past injury at the San Francisco airport (and had

2

**United States District Court**
For the Northern District of California

1    successfully settled that part of the case), she had voluntarily left the United States and, as a

2    nonimmigrant alien abroad, no longer had standing to assert constitutional and statutory claims to

3    seek prospective relief.  Although nonimmigrant aliens in the United States had standing to assert

4    constitutional and statutory claims, the order held that a nonimmigrant alien who had voluntarily

5    left the United States and was at large abroad had no standing to assert federal claims for

6    prospective relief in our federal courts.  This holding was based on the ground that the

7    development of federal constitutional law should not be controlled by nonimmigrant aliens

8    overseas (Dkt. No. 197).  A second appeal followed.

9         Our court of appeals, while affirming in part, reversed (over a dissent) as to prospective

10   standing by holding that even a nonimmigrant alien who had voluntarily left the United States

11   nonetheless had standing to litigate federal constitutional claims in district court in the United

12   States as long as the alien had a "substantial voluntary connection" to the United States.  *Ibrahim*

13   *v. Dep't of Homeland Sec.*, 669 F.3d 983, 993–94 (9th Cir. 2012) ("*Ibrahim II*").  Plaintiff had

14   such a connection, our court of appeals held, because of her time at Stanford University, her

15   continuing collaboration with professors in the United States, her membership in several

16   professional organizations located in the United States, the invitations for her to return, and her

17   network of close friends in the United States.  The government did not seek review by the United

18   States Supreme Court.

19        On the second remand, the government moved to dismiss again.  This was denied.  The

20   parties and the judge then became embroiled in discovery disputes involving the state secrets

21   privilege, the law enforcement privilege, and so-called "sensitive security information" ("SSI"),

22   49 U.S.C. 114(r) and 49 C.F.R. 1520.5.  Defendants invoked these as bases for withholding

23   classified and otherwise allegedly sensitive government information from plaintiff and her

24   counsel.  A pair of orders dated April 19, 2013, granted in part and denied in part plaintiff's

25   motion to compel production (Dkt. Nos. 462, 464).  Resolving these disputes required individual

26   review by the district judge of all of the documents sought by plaintiff.  Most of this review was

27   conducted *ex parte* and *in camera* due to the privileged and classified nature of the documents.

28   The state secrets privilege was upheld as to nearly all of the classified documents in question.

3

The government's assertion of other privileges regarding non-classified documents was overruled as to the majority of the remaining documents.  Plaintiff's counsel became cleared to receive SSI, but never tried to become cleared to read classified information.  (Plaintiff herself was never cleared to receive either SSI or classified information.)  Subsequent rounds of contentious discovery motions resulted in yet further *ex parte* and *in camera* review.  Again, the government's assertions of the state secrets privilege were upheld, while its assertions of other privileges were upheld in part and overruled in part (Dkt. Nos. 539, 548).

One recurring procedural issue concerned the effect of an assertion of state secrets.  The government announced on at least two occasions that if state secrets were invoked, then that evidence could not be relied upon by either side.  The evidence was simply out of the case, the government said (Dkt. Nos. 417, 534).  After making such representations on the record, an order dated September 13, 2013, provided the government with another opportunity to clarify its position (Dkt. No. 540).  The order stated:

> Plaintiff's pending motion to compel production of documents (Dkt. No. 515) raises questions regarding what evidence the government intends to rely on at summary judgment and at trial.  The Court is of the view that the government may not rely in any way upon any information it has refused to turn over to plaintiff in response to a reasonable request.  The government shall file a submission stating whether it agrees with or objects to this principle by September 17 at Noon.

The government responded:

> In response, Defendants affirm that they will not rely on any information they have withheld on grounds of privilege from Plaintiff in response to a discovery request in this case.  Defendants are mindful of the Court's December 20, 2012 ruling (Dkt. [No.] 399) that the Government may not affirmatively seek to prevail in this action based upon information that has been withheld on grounds of privilege, and have acted in a manner consistent with that ruling in both the assertion of privilege and summary judgment briefing.

(Dkt. No. 541).  As will be seen, however, the government reversed course at trial and sought to prevail by having this action dismissed due to its inability to disclose state secrets, citing precedent by our court of appeals.

4

United States District Court

For the Northern District of California

1    As trial approached, a number of expert disclosure and discovery disputes were raised in

2  late September and October 2013.  (There was also a brief stay in light of the appropriations

3  shutdown for the Department of Justice.)  A pair of orders permitted plaintiff to revise an expert

4  report, allowed the government to take a second one-day deposition of the expert, and ordered

5  him to produce interview notes he considered in forming his opinions at least 24 hours prior to his

6  second deposition, once a proper subpoena was served (Dkt. Nos. 580, 585).

7    A hearing was held on the government's motion for summary judgment on October 31,

8  2013.  The vast majority of the hearing time, however, was consumed over whether or not the

9  trial should be public and whether certain information listed on plaintiff's demonstratives was

10  subject to various privileges.  The government argued that plaintiff had not yet sought and

11  received a final determination by the TSA regarding whether certain information was SSI

12  pursuant to Section 525(a) and (d) of the Homeland Security Appropriations Act, 2007, Pub. L.

13  No. 109-295, Section 525(a), (d), 120 Stat. 1355, 1382 (Oct. 4, 2006).  The government further

14  argued that plaintiff's counsel could only challenge a final order designating information as SSI

15  in the United States Court of Appeals for the District of Columbia.  The same day, plaintiff

16  submitted a request to the TSA.  The TSA subsequently identified certain information as SSI.

17  Possibly, an appeal from that order has been taken but the parties have not so indicated

18    The government's motion for summary judgment was granted in limited part but mostly

19  denied (Dkt. No. 592).  The "exchange of information" claim based on the First Amendment was

20  dismissed.  Plaintiff's claims based on procedural and substantive due process, equal protection,

21  and First Amendment rights of expressive association and retaliation proceeded to trial.  Lack of

22  standing was raised yet again by the government and denied.

23    For the first time, and contrary to what it had represented before, the government further

24  argued that summary judgment in its favor was appropriate based on state secrets, citing to our

25  court of appeals' decision in *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir.

26  2010) (en banc).  That motion was denied to provide an opportunity to see how the evidence

27  would actually develop at trial and the extent to which at least portions of the case could be tried

28  and decided without regard to state secrets.

United States District Court

For the Northern District of California

1    A final pre-trial conference was held on November 15, 2013, during which the parties'

2  motions *in limine* were heard. Plaintiff sought to exclude evidence submitted *ex parte*, to recuse

3  the undersigned judge based on his having reviewed relevant classified documents (in order to

4  rule on various discovery requests), and to exclude two of defendants' may-call witnesses. The

5  government sought to exclude plaintiff's experts, to exclude 22 of 42 "may call" witnesses on

6  plaintiff's witness list, and to exclude certain trial exhibits. The final pre-trial order denied the

7  motions *in limine*, but the motion to exclude and prevent plaintiff from calling Attorney General

8  Eric Holder and James Clapper, Director of National Intelligence, was granted (Dkt. No. 616).

9    At the final pretrial conference, the government also made what amounted to a motion for

10  reconsideration of its motion for summary judgment on state secrets, previously denied. The

11  government argued that the action should be dismissed because the core of the case had been

12  excluded as state secrets. The motion was denied on several grounds. *First*, the government

13  failed to raise such an argument until weeks before trial. *Second*, it was unsettling for the

14  government to completely reverse its prior position that the effect of invoking the state secrets

15  doctrine was to exclude the evidence from the action. *Third*, even under *Jeppesen*, 614 F.3d at

16  1080, it could not be said with certainty that plaintiff would be unable to prove her case at trial or

17  defendants would be absolutely deprived of a meritorious and complete defense. The Court's

18  plan was to allow both sides to present their unclassified evidence through the "normal" trial

19  procedure and then to allow the government to submit an *ex parte* and under seal submission to

20  try to explain how its state secrets might bear on the actual trial issues.

21    Five days before trial, the government filed another request seeking to exclude a plaintiff

22  expert because of his refusal to produce documents pursuant to a subpoena issued by the District

23  of Columbia and served at his second deposition (after two failed attempts to serve him). Plaintiff

24  produced non-privileged documents to the government and defendants cross-examined the expert

25  at trial. That dispute was accordingly resolved.

26    The bench trial then began on December 2, 2013. On the first day of trial, before opening

27  statements, plaintiff's counsel reported that plaintiff's daughter — a United States citizen born in

28  the United States and a witness disclosed on her witness list — was not permitted to board her

United States District Court
For the Northern District of California

1  flight from Kuala Lumpur to attend trial, evidently because she too was on a no-fly list. Counsel

2  were asked to investigate. Immediately after trial, on December 6, an evidentiary hearing

3  regarding plaintiff's daughter's travel difficulties was held. Plaintiff and the government

4  submitted declarations. One live witness was examined. The snafu was the result of government

5  error, albeit corrected quickly, as will be outlined at the end of the findings of fact. Plaintiff's

6  counsel was given the option to reopen the trial to permit the daughter to appear late and testify,

7  which counsel chose not to do. Instead, counsel asked for inclusion of the evidentiary hearing

8  and associated declarations in the trial record. The government objected to reopening the trial

9  record. The parties were permitted to file proposed contingent findings of fact and conclusions of

10  law based on the evidentiary hearing and associated declarations.

11       *No classified information was used at trial (nor referenced in this order).* Nonetheless, at

12  numerous times throughout the trial, there were privilege assertions and motions to close the

13  courtroom. These were based on a statutory privilege called "sensitive security information"

14  ("SSI") and a common law privilege known as the "law enforcement privilege." Due to these

15  assertions, at least ten times, the Court reluctantly asked the press and the public to leave the

16  courtroom.

17       After a one-week bench trial, lengthy findings of fact and conclusions of law, and

18  responses, were proposed by both sides. Rather than merely vet each and every finding and

19  conclusion proposed by the parties, this order has navigated its own course through the evidence

20  and arguments, although many of the proposals have found their way into this order. Any

21  proposal that has been expressly agreed to by the opposing side at least in part, however, shall be

22  deemed adopted (to the extent agreed upon), even if not expressly adopted herein. It is

23  unnecessary for this order to cite the record for all of the findings herein. Citations will only be

24  provided as to particulars that may assist the court of appeals. All declarative statements herein

25  are factual findings.

26

27

28

United States District Court
For the Northern District of California

# FINDINGS OF FACT

## PLAINTIFF

1.     Dr. Rahinah Ibrahim is a subject of Malaysia, a scholar, a wife, and a mother of four children. She lawfully entered the United States in 1983 to study architecture at the University of Washington in Seattle, where she graduated in 1987. While living in Seattle, she married her husband, Mustafa Kamal Mohammed Zaini, and had her first daughter, Raihan Binti Mustafa Kamal. Mr. Zaini is a subject of Malaysia, not a citizen of the United States. Her daughter, Ms. Kamal, is a United States citizen, having been born in Seattle.

2.     Dr. Ibrahim received her master of architecture in 1990 from the Southern California Institute of Architecture in Santa Monica, California.

3.     She returned to Malaysia, worked as an architect, and eventually became a lecturer at the Universiti Putra Malaysia. She was the department's first female lecturer. During this time, she met Stanford Professor Boyd Paulson, who encouraged her to apply to Stanford University.

4.     In 2000, Dr. Ibrahim returned to the United States under an F-1 student visa to work towards a Ph.D. in construction engineering and management at Stanford University. While studying at Stanford, she was involved in the Islamic Society of Stanford University and volunteered with the spiritual care services at Stanford Hospital. Dr. Ibrahim also attended prayers at the MCA in Santa Clara, a Muslim place of worship. She eventually received a Ph.D from Stanford University.

5.     Government counsel has conceded at trial that Dr. Ibrahim is not a threat to our national security. She does not pose (and has not posed) a threat of committing an act of international or domestic terrorism with respect to an aircraft, a threat to airline passenger or civil aviation security, or a threat of domestic terrorism. This the government admits and this order finds.

6.     On September 11, 2001, radical Islamic terrorists destroyed the World Trade Center in New York City and part of the Pentagon alongside the Potomac and commandeered United Airlines Flight 93, leading to its crash in Pennsylvania. More than 2,900 victims were

United States District Court

For the Northern District of California

1  killed.

2       7.     In November 2004, FBI Special Agent Kevin Michael Kelley, located in San Jose,

3  nominated Dr. Ibrahim, who was then at Stanford, to various federal watchlists using the NCIC

4  Violent Gang and Terrorist Organizations File Gang Member Entry Form ("VGTOF") (TX 8).

5  VGTO, also known as Violent Gang and Terrorist Organization, was an office within the FBI's

6  National Crime Information Center ("NCIC").  VGTOF was a file within the FBI's NCIC.

7       Agent Kelley misunderstood the directions on the form and erroneously nominated Dr.

8  Ibrahim to the TSA's no-fly list and the Interagency Border Information System ("IBIS").  He did

9  not intend to do so.  This was a mistake, he admitted at trial.  He intended to nominate her to the

10  Consular Lookout and Support System ("CLASS"), the TSA selectee list, TUSCAN (information

11  exported to Canada), and TACTICS (information exported to Australia).  He checked the wrong

12  boxes, filling out the form exactly the opposite way from the instructions on the form.  He made

13  this mistake even though the form stated, "It is recommended the subject NOT be entered into the

14  following selected terrorist screening databases."  An excerpt of Agent Kelley's nomination form

15  is provided below:

16

17  It is recommended the subject **NOT** be entered into the following selected terrorist screening databases:

    ☒    Consular Lookout and Support System (CLASS)

18

19      ☐    Interagency Border Information System (IBIS)

    ☐    TSA No Fly List

20

21      ☒    TSA Selectee List

22      ☒    TUSCAN

23      ☒    TACTICS

24      **Figure 1.  VGTOF Form (November 2004.)**

25  Based on the way Agent Kelley checked the boxes on the form, plaintiff was placed on the no-fly

26  list and IBIS (but not on CLASS, the selectee list, TUSCAN, or TACTICS).  So, the way in

27  which plaintiff got on the no-fly list in the first place was human error by the FBI.  Agent Kelley

28  did not learn of this error until his deposition in September 2013.

United States District Court

For the Northern District of California

8.      Around the same time, Agent Kelley's squad conducted a mosque outreach program.  One purpose of the program was to provide a point of contact for mosques and Islamic associations.  The outreach program included Muslims and Sikhs in the South Bay.

9.      In December 2004, Agent Kelley and his colleague interviewed Dr. Ibrahim, again while she was attending Stanford University.  (This was after he had filled out the form wrong.)  He asked, among other things, about her plans to attend a conference in Hawaii, her thesis work, her plans after graduation, her involvement in the Muslim community, her husband, her travel plans, and the organization Jemaah Islamiyah (TX 4, 116).

10.     Jemaah Islamiyah is (and was then) on the Department of State's list of designated foreign terrorist organizations (TX 13).  The FOIA-produced version of Agent Kelley's interview notes with Dr. Ibrahim were designated by the FBI as "315," which means "International Terrorism Investigations" (TX 4, 116, 516).  Jemaah Islah Malaysia,  a similar sounding name, is not a terrorist organization but a Malaysian professional organization composed primarily of individuals who studied in the United States or Europe.  Other than Jemaah Islah Malaysia coming up at trial when counsel asked about it, the significance of this possible point of confusion has been obscured by counsel.  This order does not find that Agent Kelley confused the two organizations.

**EVENTS FROM JANUARY 2005 TO MARCH 2005**

11.     In early January 2005, Dr. Ibrahim planned to fly from San Francisco to Hawaii and then to Los Angeles and thence to Kuala Lumpur.  Her plans were to attend a conference in Hawaii (sponsored by Stanford University) from January 3 to January 6 and to present her research findings at the conference.

12.     On January 2, 2005, Dr. Ibrahim arrived at the San Francisco airport with her daughter, Rafeah, then fourteen.  At the time, Dr. Ibrahim was still recovering from her hysterectomy surgery performed three months earlier and thus requested wheelchair assistance to the airport gate.

13.     The trouble started when Dr. Ibrahim arrived at the United Airlines counter.  The police were called by airline staff.  She was handcuffed and arrested.  She was escorted to a police

United States District Court

For the Northern District of California

1    car (while handcuffed) and transported to a holding cell by male police officers.  There, a female

2    police officer asked her if she had any weapons and attempted to remove her hiijab.

3          14.    She was held for approximately two hours.  Paramedics were called so that

4    medication related to her hysterectomy surgery could be administered.

5          15.    Eventually, an aviation security inspector with the Department of Homeland

6    Security informed Dr. Ibrahim that she was released and her name had been removed from the no-

7    fly list.  The police were satisfied that there were insufficient grounds for making a criminal

8    complaint against her (TX 31).  The trial record shows no evidence that would have justified a

9    detention or arrest.  She was told that she could fly to Hawaii the next day.  She did, voluntarily.

10   She was, however, given an unusual red boarding pass (in addition to her regular boarding pass)

11   with "SSSS," meaning Secondary Security Screening Selection, printed on it.

12         16.    Dr. Ibrahim flew to Hawaii and presented her research findings at the conference.

13   From there, she flew to Los Angeles and then to Kuala Lumpur.  That was in January 2005.

14         17.    The next trouble came two months later.  In March 2005, Dr. Ibrahim planned to

15   visit the United States to meet with one of her Stanford thesis advisors and her friend, Professor

16   Paulson, who was very ill.  She was not permitted to board the flight to the United States.  She

17   was told her  F-1 student visa had been revoked, which in fact it had been, as will be detailed

18   below.  The ticket cost was approximately one month's salary at the time.  The record is unclear

19   as to the extent to which she was able to get reimbursed.  So, even though she had been told she

20   was off the no-fly list, she was now being told that she could not come to the United States,

21   regardless of how she traveled.  She has never been permitted to return to the United States since.

22                 TERRORIST SCREENING DATABASE AND RELATED WATCHLISTS

23         18.    The government maintains a web of interlocking watchlists, all now centered on

24   the Terrorist Screening Database ("TSDB").  This web and how they interlock are important to

25   the relief sought and awarded herein.  The present tense is used but the findings accurately

26   describe the procedures in place at the time in question (except as indicated otherwise).

27

28

United States District Court
For the Northern District of California

19.     The Terrorist Screening Center ("TSC") is a multi-agency organization administered by the FBI.  The TSC is staffed by officials from various agencies, including the FBI, the Department of Homeland Security, and the Department of State.  The TSC manages the Terrorist Screening Database.  The TSC and TSDB were created after September 11 so that information about known and suspected terrorists could be more centralized and then exported as appropriate to various "customer databases" operated by other agencies and government entities.  In this way, "the dots could be connected."  Information in the TSDB is *not* classified, although a closely allied and separate database called the Terrorist Identities Datamart Environment ("TIDE") does contain classified information.  (The predecessor to TIDE was called TIPOFF.)  The National Counterterrorism Center ("NCTC"), a branch of the Office of the Director of National Intelligence, places classified substantive "derogatory" information supporting a nomination to the TSDB in TIDE.  These terrorist watchlists, and others, provide information to the United States intelligence community, a coalition of 17 agencies and organizations within the Executive Branch, including the Office of the Director of National Intelligence and the FBI.

20.     FBI agents and other government employees normally nominate individuals to the TSDB using a "reasonable suspicion standard," meaning articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities.  Unlike a standard codified by Congress or rendered by judicial decision, this "reasonable suspicion" standard was adopted by internal Executive Branch policy and practice.  From 2004 to 2007, there was no uniform standard for TSDB nominations.  Each agency promulgated its own nominating procedures for inclusion in the TSDB based on its interpretation of homeland security presidential directives and the memorandum of opinion that established the TSC.  One such directive was Homeland Security Presidential Directive 6 ("HSPD-6") which stated, "[t]his directive shall be implemented in a manner consistent with the provisions of the Constitution and applicable laws, including those protecting the rights of all Americans" (TX 538).  Agents now interpret this guideline, and others, as meaning that it would

not be appropriate to watchlist someone based upon their religion, religious practices, and any other First Amendment activity.

21.     For each nominee, the TSDB calls out which particular watchlists the nominee should be on and which he or she should not be on.  It is a box-check procedure, then computerized.  There are several watchlists affected by the TSDB, namely:

- the no-fly list (TSA),

- the selectee list (TSA),

- Known and Suspected Terrorist File ("KSTF," previously known as the Violent Gang and Terrorist Organizations File),

- Consular Lookout and Support System ("CLASS," including CLASS-Visa and CLASS-Passport) (Department of State),

- TECS (not an acronym, but the successor of the Treasury Enforcement Communications System) (Department of Homeland Security),

- Interagency Border Inspection System ("IBIS") (Department of Homeland Security),

- TUSCAN (used by Canada), and

- TACTICS (used by Australia).

If nominated, designations in the TSDB are then exported to the nominated downstream customer watchlists operated by various government entities.  For example, information in the TSDB (if selected) is sent to the Department of State for inclusion in CLASS-Visa or CLASS-Passport.

22.     Due to Agent Kelley's mistake, Dr. Ibrahim was nominated to the no-fly and IBIS watchlists.  She was placed in the TSDB and her information was exported to the no-fly list and IBIS.  Thus, when she arrived at the ticket counter, the airline (which has and had access to the no-fly list), was obligated to deny her boarding (and then called the police).

23.     When persons are placed on the no-fly list or any other watchlist, they receive no formal notice of such placement and may never learn of such placement until, if ever, they attempt to board a plane or do any other act covered by the watchlist.

24.     When an agency "encounters" an individual via a visa application, airport boarding, border entry, to take three examples, the agency official searches for the individual's identity on applicable watchlists.  If there is a potential name match, the individual's name is

13

United States District Court
For the Northern District of California

1  forwarded to the TSC.  The TSC, in turn, reviews the TSDB record and an appropriate

2  counterterrorism response may be made.

3             **TRAVEL REDRESS INQUIRY PROGRAM (TRIP)**

4        25.     Under Section 44926(a) of Title 49 of the United States Code:

5               The Secretary of Homeland Security shall establish a timely and
             fair process for individuals who believe they have been delayed or
6               prohibited from boarding a commercial aircraft because they were
             wrongly identified as a threat under the regimes utilized by the
7               Transportation Security Administration, United States Customs and
             Border Protection, or any other office or component of the
8               Department of Homeland Security.

9  Prior to 2007, individuals who claimed they were denied or delayed boarding or entry to the

10  United States or repeatedly subjected to additional screening or inspection could submit a

11  Passenger Identity Verification Form (PIVF) to the TSA.  This program was succeeded by the

12  DHS's TRIP process in 2007.

13        26.     If DHS determines that the complainant is an exact or near match to an identity in

14  the TSDB, the match is referred to the TSC's redress unit.

15        27.     The TSC's redress unit reviews the information available to determine (1) whether

16  the individual's status is an exact match to an identity in the TSDB; (2) if an exact match, whether

17  the traveler should continue to be in the TSDB; and (3) if the traveler should continue to be in the

18  TSDB, whether the traveler meets additional criteria for placement on the no-fly or selectee lists.

19        28.     The TSC's redress unit does not undertake additional fieldwork in determining

20  whether an individual was properly placed in the TSDB or customer databases.  The review is

21  based on existing records and may (or may not) include contacting the nominating agency to

22  obtain any new derogatory information that supports a nomination.  The TSC's redress unit then

23  notifies DHS TRIP of any modification or removal of the individual's record.

24        29.     A letter responding to the request for redress is eventually sent to the complainant.

25  Dr. Ibrahim attempted to use this redress method and received a vague and inconclusive response,

26  described below.

27

28

United States District Court
For the Northern District of California

### DEPARTMENT OF STATE AND VISA PROCEDURE

30.     A visa is permission for an alien, also known as a foreign national, to approach the borders of the United States and ask to enter.  There are several types of visas, based primarily on the purpose of the alien's travel to the United States.

31.     The procedure for obtaining a visa is as follows.  *First*, the alien applies for a visa by submitting a visa application to a consular officer.  The consular officer then evaluates whether the individual is eligible for a visa and what type of visa he or she may be eligible to receive.  *Second*, the applicant makes an appointment for a visa interview with a consular officer at the United States embassy or a consulate abroad.  Consular officers are employees of the Department of State who are authorized to adjudicate visa applications overseas.  *Third*, an interview is conducted.  *Fourth*, after the interview, the consular officer grants or denies the application.  Consular officers are required to refuse a visa application if the alien has failed to demonstrate eligibility for the visa under the Immigration and Nationality Act, including under 8 U.S.C. 1182.

32.     In ruling on applications, consular officers review the CLASS database, maintained by the Department of State, for information that may inform the visa application and adjudication process.  Information is entered into CLASS directly by the Department of State or indirectly from other agencies.  For example, entries in the Department of Homeland Security's TECS database can be electronically transferred over to CLASS to inform the visa adjudication process.  CLASS also obtains information from the TSDB.

33.     If the consular officer determines that further information is needed or if there is insufficient information to make an adjudication, the consular officer may refuse an individual's visa application under 8 U.S.C. 1201(g), request further information from the applicant, and/or request a Security Advisory Opinion ("SAO") from the Department of State.  A SAO request initiates an interagency review of information about the applicant available to the Department of State and other agencies, including classified intelligence in TIDE, to determine whether the alien is inadmissible under 8 U.S.C. 1182(a)(3)(A) or (B) or otherwise ineligible for a visa.  If requested, a SAO opinion is rendered and the consular officer reviews the SAO opinion.  The consular officer then decides whether to issue the visa or refuse the visa application.

34.    Once a visa issues, if pertinent information comes to the attention of the Department of State that was not available to the consular officer at the time of issuance, an additional review of the alien's eligibility and admissibility may be conducted.  Section 1201(i) states: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation . . . ."  The visa may be "prudentially" revoked, thereby making the individual ineligible to approach the borders of the United States.  Within the Department of State, such a revocation is called "prudential."  Such a prudential revocation forces the alien to reapply for a new visa, so that a new evaluation of the applicant's eligibility and admissibility can be made.  When an alien's visa is revoked, the alien is informed of his or her right to establish their qualification for a visa through a new visa application.

35.    The visa office in the Department of State keeps "revocation files" that explain the basis for an entry in the CLASS database until the applicant reaches age ninety and has no visa application within the past ten years.

### PLAINTIFF AND THE WATCHLISTS

36.    Dr. Ibrahim obtained a F-1 student visa to attend Stanford University for her Ph.D. for at least the duration of 2000 to 2005.

37.    In November 2004, Agent Kelley nominated Dr. Ibrahim to the TSDB as he intended, but, by his human error, his nomination form wrongly caused plaintiff to be placed on the no-fly list (and in the IBIS database).

38.    Shortly after the arrest and detention, on or around January 2, 2005, the TSC determined that Dr. Ibrahim should not have been on the no-fly list and her name was thereafter removed from the no-fly list.  She, however, remained in the TSDB and on the selectee and CLASS lists.

39.    In an e-mail dated January 3, 2005, between two officials in the coordination division of the visa office, one wrote (TX 16) (emphasis in original):

> As I mentioned to you, I have a stack of pending revocations that are based on VGTO entries.  These revocations contain virtually no derogatory information.  After a *long* and frustrating game of phone

**United States District Court**
For the Northern District of California

> tag with INR, TSC, and Steve Naugle of the FBI's VGTO office, finally we're going to revoke them.
>
> Per my conversation with Steve, there is no practical way to determine what the basis of the investigation is for these applicants. The only way to do it would be to contact the case agent for each case individually to determine what the basis of the investigation is. Since we don't have the time to do that (and, in my experience, case agents don't call you back promptly, if at all), we will accept that the opening of an investigation itself is a prima facie indicator of potential ineligibility under 3(B) . . . .

40.     A pending revocation for Dr. Ibrahim was in the above-referenced stack. (Again, VGTO referred to the FBI's Violent Gang and Terrorist Organization office; INR refers to the Department of State's Bureau of Intelligence and Research; and the term 3(B) referred to Section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B)).)

41.     Dr. Ibrahim's F-1 student visa was revoked on January 31, 2005. The certificate of revocation stated: "subsequent to visa issuance, information has come to light indicating that the alien may be inadmissible to the United States and ineligible to receive a visa under section 212(a)(3)(B) of the Immigration and Nationality Act, such that the alien should reappear before a U.S. Consular Officer to establish his eligibility for a visa before being permitted to apply for entry to the United States" (TX 15). The trial record does not explain what "information" had come to light. After Dr. Ibrahim's visa was revoked, the Department of State entered a record into CLASS that would notify any consular officer adjudicating a future visa application submitted by Dr. Ibrahim that Dr. Ibrahim may be inadmissible under 8 U.S.C. 1182(a)(3)(B).

42.     The revocation was pursuant to Section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B). The revocation itself was on January 31, 2005, and Dr. Ibrahim learned of the revocation in March 2005.

43.     In an e-mail dated February 8, 2005, between the chief of the consular section at the United States Embassy in Kuala Lumpur and an official in the coordination division of the visa office of the Department of State, the chief asked about a prudential visa revocation cable he had received concerning the events Dr. Ibrahim experienced in January 2005. The Department of State employee replied in e-mail stating (TX 17):

> Paul asked me to respond to you on this case, as I handle revocations in VO/L/C. The short version is that this person's visa was revoked

17

United States District Court
For the Northern District of California

1  |  because there is law enforcement interest in her as a potential
2  |  terrorist. This is sufficient to prudentially revoke a visa but doesn't
   |  constitute a finding of ineligibility. The idea is to revoke first and
3  |  resolve the issues later in the context of a new visa application . . . .
   |  My guess based on past experience is that she's probably issuable.
4  |  However, there's no way to be sure without putting her through the
   |  interagency process. I'll gin up the revocation.

5  VO/L/C is the designation of the coordination division within the visa office.

6   44.   After she tried unsuccessfully to return to the United States in March 2005, using

7  what she thought was a valid student visa, a letter arrived for Dr. Ibrahim, dated April 2005,

8  stating: "[t]he revocation of your visa does not necessarily indicate that you are ineligible to

9  receive a U.S. visa in future [sic]. That determination can only be made at such time as you apply

10  for a new visa. Should you choose to do so, instructions can be found on the Embassy web site at

11  http://malaysia.usembassy.gov" (TX 224).

12   45.   To repeat, government counsel have conceded at trial and this order finds that Dr.

13  Ibrahim is not a threat to the national security of the United States. She does not pose (and has not

14  posed) a threat of committing an act of international or domestic terrorism with respect to an

15  aircraft, a threat to airline passenger or civil aviation security, or a threat of domestic terrorism.

16   46.   In March 2005, Dr. Ibrahim filed a Passenger Identity Verification Form (PIVF)

17  (TX 76).

18   47.   In December 2005, Dr. Ibrahim was removed from the selectee list. Around this

19  time, however, she was added to TACTICS (used by Australia) and TUSCAN (used by Canada).

20  No reason was provided for this at trial.

21   48.   On January 27, 2006, this action was filed.

22   49.   In a form dated February 10, 2006, an unidentified government agent requested that

23  Dr. Ibrahim be "Remove[d] From ALL Watchlisting Supported Systems (For terrorist subjects:

24  due to closure of case AND no nexus to terrorism)" (TX 10). For the question "Is the individual

25  qualified for placement on the no fly list," the "No" box was checked. For the question, "If no, is

26  the individual qualified for placement on the selectee list," the "No" box was checked.

27   50.   In 2006, the government determined that Dr. Ibrahim did not meet the reasonable

28  suspicion standard. On September 18, 2006, Dr. Ibrahim was removed from the TSDB. The trial

United States District Court

For the Northern District of California

record, however, does not show whether she was removed from all of the customer watchlists subscribing to the TSDB.

51.     In a letter dated March 1, 2006, the TSA responded to Dr. Ibrahim's PIVF submission as follows (TX 40):

> The Transportation Security Administration (TSA) has received your Passenger Identity Verification Form (PIVF) and identity documentation.  In response to your request, we have conducted a review of any applicable records in consultation with other federal agencies, as appropriate.  Where it has been determined that a correction to records is warranted, these records have been modified to address any delay or denial of boarding that you may have experienced as a result of the watchlist screening process . . . .  This letter constitutes TSA's final agency decision, which is reviewable by the United States Court of Appeals under 49 U.S.C. § 46110.  If you have any further questions, please call the TSA Contact Center Office of Transportation Security Redress (OTSR) toll-free at (866) 289-9673 or locally at (571) 227-2900, send an [e]-mail to TSA-ContactCenter@dhs.gov, or write to the following address . . . .

The response did not indicate Dr. Ibrahim's status with respect to the TSDB and no-fly and selectee lists.

52.     One year later, on March 2, 2007, Dr. Ibrahim was placed back in the TSDB.  The trial record does not show why or which customer watchlists were to be notified.

53.     Two months later, however, on May 30, 2007, Dr. Ibrahim was again removed from the TSDB.  The trial record does not show the extent to which Dr. Ibrahim's name was then removed from the customer watchlists, nor the reason for the removal.

54.     Dr. Ibrahim did not apply for a new visa from 2005 to 2009.  In 2009, however, she applied for a visa to attend proceedings in this action.  On September 29, 2009, Dr. Ibrahim was interviewed at the American Embassy in Kuala Lumpur for her visa application.

55.     On October 20, 2009, Dr. Ibrahim was nominated to the TSDB pursuant to a secret exception to the reasonable suspicion standard.  The nature of the exception and the reasons for the nomination are claimed to be state secrets.  In Dr. Ibrahim's circumstance, the effect of the nomination was that Dr. Ibrahim's information was exported solely to the Department of State's CLASS database and the United States Customs and Border Patrol's TECS database.

56.     From October 2009 to present, Dr. Ibrahim has been included in the TSDB, CLASS, and TECS.  She has been off the no-fly and selectee lists.

19

United States District Court

For the Northern District of California

57.     Dr. Ibrahim's 2009 visa application was initially refused under Section 221(g) of the Immigration and Nationality Act, 8 U.S.C. 1201(g), because it was determinated that there was insufficient information to make a final adjudication in the matter.  The consular officer requested a Security Advisory Opinion ("SAO") from the Department of State.  There was a concern by the consular official that Dr. Ibrahim was potentially inadmissible under Section 212(a)(3)(B) of the Immigration and Nationality Act.

58.     Section 212(a)(3)(B) provides nine classes of aliens ineligible for visas or admission into the United States based on terrorist activities.  Because that provision is lengthy and covers many different categories, and because its length bears on the relief granted herein, Section 212(a)(3)(B), 8 U.S.C. 1182(a)(3)(B), is set forth in full here:

(B) Terrorist activities

(i) In general

Any alien who--

(I) has engaged in a terrorist activity;

(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

(IV) is a representative (as defined in clause (v)) of--

(aa) a terrorist organization (as defined in clause (vi)); or

(bb) a political, social, or other group that endorses or espouses terrorist activity;

(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

(VI) is a member of a terrorist organization described in clause (vi) (III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

(VIII) has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.

An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

(ii) Exception

Subclause (IX) of clause (I) does not apply to a spouse or child–

(I) who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

(II) whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

59.     The SAO stated: "Information on this applicant surfaced during the SAO review that would support a [Section] 212(a)(3)(B) inadmissibility finding.  Post should refuse the case accordingly.  Since the Department reports all visa refusals under INA section 212(a)(3)(B) to Congress, post should notify CA/VO/L/C when the visa refusal is effected.  There has been no request for an INA section 212(d)(3)(A) waiver at this time" (TX 68).  (INA means Immigration and Nationality Act.)  Based on the SAO, the visa was denied.  Dr. Ibrahim was thus not permitted to attend proceedings in this action or return to the United States.

60.     On December 14, 2009, Dr. Ibrahim's visa application was denied.  Dr. Ibrahim was given a letter by the consular officer informing her that the Department of State was unable to issue her a visa pursuant to Section 212(a)(3)(B).  The consular officer wrote the word "(Terrorist)" on the form beside Section 212(a)(3)(B) to explain why she was deemed inadmissible.  An excerpt of the form is provided below (TX 47):

<u>IBRAHIM, Rahinah Binti</u>　　　　　　　　　　　　　　　　　　　<u>2009271 050 4 KLL</u>
Name *(Last, First, Middle)*

Dear Visa Applicant:

This office regrets to inform you that it is unable to issue a visa to you because you have been found ineligible to receive a visa under the following section(s) of the Immigration and Nationality Act. The information contained in the paragraphs marked with "X" pertain to your visa application.  Please disregard the unmarked paragraphs.

☐ Section 221(g) which prohibits the issuance of a visa to anyone whose application does not comply with the provisions of the Immigration and Nationality Act or regulations issued pursuant thereto. The following remarks apply in your case:*

☐ Section 212(a)(1) health-related grounds.

☐ Section 212(a)(4) which prohibits the issuance of a visa to anyone likely to become a public charge.

☒ Section 212(a)(3) B  ( Terrorist )  .

☐ Other:

☐ Further consideration will be given to your visa application after you obtain and present the documents listed above and/or the following:*

☐ You are eligible to apply for a waiver of the ground(s) of ineligibility.

**Figure 2.  Department of State Visa Refusal Letter.**

　　61.　　A Section 212(d)(3)(A) waiver is one granted by the Attorney General or the consular office for aliens who have certain inadmissibilities but are still permitted to obtain visas. Section 212(d)(3)(A), 8 U.S.C. 1182(d)(3)(A), states:

> Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) of this section (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) of this section (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General.  The Attorney General shall prescribe conditions, including exaction of such bonds as may be

22

*Left margin (vertical text):* United States District Court  For the Northern District of California

necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

62.     Section 40.301 of Title 22 of the Code of Federal Regulations states:

(a) Report or recommendation to Department.  Except as provided in paragraph (b) of this section, consular officers may, upon their own initiative, and shall, upon the request of the Secretary of State or upon the request of the alien, submit a report to the Department for possible transmission to the Secretary of Homeland Security pursuant to the provisions of INA 212(d)(3)(A) in the case of an alien who is classifiable as a nonimmigrant but who is known or believed by the consular officer to be ineligible to receive a nonimmigrant visa under the provisions of INA 212(a), other than INA 212(a) (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), (3)(E)(i), or (3)(E)(ii).

(b) Recommendation to designated DHS officer abroad.  A consular officer may, in certain categories defined by the Secretary of State, recommend directly to designated DHS officers that the temporary admission of an alien ineligible to receive a visa be authorized under INA 212(d)(3)(A).

(c) Secretary of Homeland Security may impose conditions.  When the Secretary of Homeland Security authorizes the temporary admission of an ineligible alien as a nonimmigrant and the consular officer is so informed, the consular officer may proceed with the issuance of a nonimmigrant visa to the alien, subject to the conditions, if any, imposed by the Secretary of Homeland Security.

63.     Section 41.121(b) sets forth the visa refusal procedure which includes informing the alien of whether grounds of ineligibility (unless disclosure is barred under Section 212(b)(2) or (3)) and whether there is, in law or regulation, a mechanism (such as waiver) to overcome the refusal.  Section 41.121(b)(1) of Title 22 of the Code of Federal Regulations states:

(1) When a consular officer knows or has reason to believe a visa applicant is ineligible and refuses the issuance of a visa, he or she must inform the alien of the ground(s) of ineligibility (unless disclosure is barred under INA 212(b)(2) or (3)) *and whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal*.  The officer shall note the reason for the refusal on the application.  Upon refusing the nonimmigrant visa, the consular officer shall retain the original of each document upon which the refusal was based, as well as each document indicating a possible ground of ineligibility, and should return all other supporting documents supplied by the applicant.

(emphasis added).

64.     The TSC has determined that Dr. Ibrahim does not currently meet the reasonable suspicion standard for inclusion in the TSDB.  She, however, remains in the TSDB pursuant to a

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  classified and secret exception to the reasonable suspicion standard.  Again, both the reasonable

2  suspicion standard and the secret exception are self-imposed processes and procedures within the

3  Executive Branch.

4      65.    In September 2013, Dr. Ibrahim submitted a visa application so that she could

5  attend the trial on this matter.  She attended a consular officer interview in October 2013.  At the

6  interview, she was asked to provide supplemental information via e-mail.  Trial in this action

7  began on December 2 and ended on December 6.  As of December 6, Dr. Ibrahim had not received

8  a response to her visa application.  At trial, however, government counsel stated verbally that the

9  visa had been denied.  Plaintiff's counsel said that they had not been so aware and that Dr. Ibrahim

10 had not been so notified.

11                          **DR. IBRAHIM TODAY**

12     66.    Dr. Ibrahim has been successful at the Universiti Putra Malaysia.  She was selected

13 as Deputy Dean in 2006 and Dean for the Faculty of Design and Architecture in 2011.

14     67.    One grant that Dr. Ibrahim received accounted for 75% of the grant funding

15 received for the entire faculty.

16     68.    Due to her inability to travel to the United States, Dr. Ibrahim has resorted to

17 collaborating with her United States colleagues via e-mail, Skype, and telephone.

18     69.    Dr. Ibrahim desires to visit the United States to attend conferences, collaborate on

19 projects, and visit venture capitalists.

20     70.    Since 2005, Dr. Ibrahim has never been permitted to enter the United States.

21                          **THE CITIZEN DAUGHTER**

22     On the first day of trial, before opening statements, plaintiff's counsel reported that

23 plaintiff's daughter, Raihan Binti Mustafa Kamal, a United States citizen and a witness disclosed

24 on plaintiff's witness list, had not been permitted to board her flight from Kuala Lumpur to Manila

25 and thence to the United States to attend trial.  Counsel were ordered to investigate.  After a post-

26 trial evidentiary hearing on the problem, this order finds as follows.

27     71.    Ms. Kamal had reservations for (i) a Malaysian Airlines flight from Kuala Lumpur

28 to Manila and (ii) a Philippine Airlines flight from Manila to San Francisco for December 2.

United States District Court
For the Northern District of California

72.     On December 1, the National Targeting Center ("NTC") within the Department of Homeland Security began vetting passengers for the Philippine Airlines flight.  NTC officers determined that Ms. Kamal was matched to a record that was listed in the TSDB in a category which notifies the Department of State and Department of Homeland Security that other government agencies may be in possession of substantive "derogatory" information about the individual that may be relevant to an admissibility determination under the Immigration and Nationality Act.  United States citizens, of course, are *not* subject to the admissibility provisions of the Immigration and Nationality Act.

73.     Within six minutes, the United States Customs and Border Patrol ("CBP") determined that Ms. Kamal appeared to be a United States citizen.  The passenger information submitted by the Philippine Airlines for her flight, however, did not include citizen information.  There was thus a need to verify her identify upon check-in.  The NTC requested additional screening of Ms. Kamal in Manila via the regional carrier liaison group ("RCLG") in Hawaii.

74.     The subject line to an e-mail dated December 1, from the Hawaii RCLG to the Philippine Airlines stated:  "POSSIBLE NO BOARD REQUESTPNR WNDYJS" and stated "NOTICE TO AIR CARRIER The [DHS and CBP] recommends the airline to contact HRCLG when the following passenger shows up to check in counter to verify information regarding passenger . . . Mustafa Kamal, R" (Dugan Decl. Exh. A).

75.     Before the scheduled departure time, the RCLG was merely advised that Ms. Kamal did not arrive for her scheduled departure.

76.     On December 2, Ms. Kamal's records were updated in the TSDB to reflect that she was a United States citizen.  The request for additional screening was rescinded and it was requested that Ms. Kamal be allowed to board without delay.

25

United States District Court

For the Northern District of California

# CONCLUSIONS OF LAW

## DUE PROCESS

At long last, the government has conceded that plaintiff poses no threat to air safety or national security and should never have been placed on the no-fly list. She got there by human error within the FBI. This too is conceded. This was no minor human error but an error with palpable impact, leading to the humiliation, cuffing, and incarceration of an innocent and incapacitated air traveler. That it was human error may seem hard to accept — the FBI agent filled out the nomination form in a way *exactly* opposite from the instructions on the form, a bureaucratic analogy to a surgeon amputating the wrong digit — human error, yes, but of considerable consequence. Nonetheless, this order accepts the agent's testimony.

Since her erroneous placement on the no-fly list, plaintiff has endured a litany of troubles in getting back into the United States. Whether true or not, she reasonably suspects that those troubles are traceable to the original wrong that placed her on the no-fly list. Once derogatory information is posted to the TSDB, it can propagate extensively through the government's interlocking complex of databases, like a bad credit report that will never go away. As a post-deprivation remedy, therefore, due process requires, and this order requires, that the government remediate its wrong by cleansing and/or correcting all of its lists and records of the mistaken 2004 derogatory designation and by certifying that such cleansing and/or correction has been accurately done as to every single government watchlist and database. This will not implicate classified information in any way but will give plaintiff assurance that, going forward, her troubles in returning to the United States, if they continue, are unaffected by the original wrong.

The basic issue is what due process of law requires in these circumstances. The Supreme Court has stated that "[d]ue process . . . is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). To determine what process is constitutionally due, the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), set forth the following three-factor test:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest.

Due process provides heightened protection against government interference when certain fundamental rights and liberty interests are involved. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

With respect to Dr. Ibrahim, the private interests at stake in her 2005 deprivations were the right to travel, *Kent v. Dulles*, 357 U.S. 116, 125 (1958), and the right to be free from incarceration, *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004), and from the stigma and humiliation of a public denial of boarding and incarceration, *Paul v. Davis*, 424 U.S. 693, 701, 711 (1976), any one of which would be sufficient and all three of which apply on this record.

With respect to the government's interest, all would surely agree that our government must and should track terrorists who pose a threat to America — not just to its air travel — but to any aspect of our national security. In this connection, however, the government concedes that Dr. Ibrahim herself poses no such threat (nor did she in 2005).

The final *Mathews* factor is the risk of an erroneous deprivation through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. FBI Agent Kelley made a plain, old-fashioned, monumental error in filling out the VGTOF nomination form for Dr. Ibrahim. He checked the boxes *in exactly the opposite way* from the instructions on the form, thus nominating Dr. Ibrahim to the no-fly list (against his intention). This was the start of all problems in Dr. Ibrahim's case. Surprisingly, Agent Kelley first learned of this mistake eight years later at his deposition.

Significantly, therefore, our case involves a conceded, proven, undeniable, and serious error by the government — not merely a risk of error. Consequently, this order holds that due process entitles Dr. Ibrahim to a correction in the government's records to prevent the 2004 error from further propagating through the various agency databases and from causing further injury to Dr. Ibrahim. By this order, all defendants shall specifically and thoroughly query the databases maintained by them, such as the TSDB, TIDE, CLASS, KSTF, TECS, IBIS, TUSCAN, TACTICS,

27

1   and the no-fly and selectee lists, and to remove all references to the designations made by the

2   defective 2004 nomination form or, if left in place, to add a correction in the same paragraph that

3   the designations were erroneous and should not be relied upon for any purpose.  To be clear, no

4   agency should even rely on Agent Kelley's actual unexpressed intention to nominate to certain

5   lists in 2004, for the form instructions were not properly followed.  The designations in the

6   November 2004 form should be disregarded for all purposes.  The government is always free to

7   make a new nomination doing it the right way.  A deadline will be set for defendants to file

8   declarations under oath attesting to compliance.

9        It is perhaps true that the error has already been corrected, at least in part, but there is

10  reason to doubt that the error and all of its echoes have been traced and cleansed from all

11  interlocking databases.  A correction in the TSDB and TIDE would *not* have automatically

12  expunged incorrect data previously exported from the TSDB and TIDE to the customer agency

13  databases.  For example, the Department of State separately maintains its CLASS database.  If the

14  bad information was transferred from the TSDB and TIDE to CLASS in the 2004 period, then that

15  bad information may remain there and may linger on there notwithstanding a correction in the

16  TSDB and TIDE.  This order will require defendants to trace through each agency database

17  employing the TSDB and TIDE and make sure the correction or deletion has actually been made.

18       This order finds that suspicious adverse effects continued to haunt Dr. Ibrahim in 2005 and

19  2006, even though the government claims to have learned of and corrected the mistake.  For

20  example, after her name was removed from the no-fly list, the next day, Dr. Ibrahim was issued a

21  bright red "SSSS" pass.  Less than a month after she was removed from the no-fly list, her visa

22  was "prudentially" revoked.  In March 2005, she was not permitted to fly to the United States.  Her

23  daughter was not allowed to fly to the United States even to attend this trial despite the fact that

24  her daughter is a United States citizen.  After so much gnashing of teeth and so much on-the-list-

25  off-the-list machinations, the government is ordered to provide the foregoing relief to remediate its

26  wrong.  If the government has already cleansed its records, then no harm will be done in making

27  sure again and so certifying to the Court.

28

United States District Court

For the Northern District of California

1       With respect to the government's TRIP program, which does provide a measure of post-

2   deprivation relief, this order holds that it is inadequate, at least on this record.  After Dr. Ibrahim

3   was denied boarding on January 2, 2005, and denied boarding to return in March 2005, she

4   submitted a Passenger Identity Verification Form (PIVF), a program that eventually morphed into

5   the TRIP program by 2007.  Approximately one year later, the TSA responded to her PIVF form

6   with the following vague response (TX 40):

>           Where it has been determined that a correction to records is
>           warranted, these records have been modified to address any delay or
>           denial of boarding that you may have experienced as a result of the
>           watchlist screening process.

Noticeably missing from the response to Dr. Ibrahim was whether there had been errors in her files

and whether all errors in customer databases had been corrected.  This vague response fell short of

providing any assurance to Dr. Ibrahim — who the government concedes is not a national security

threat and was the victim of concrete, reviewable adverse government action caused by

government error — that the mistake had been traced down in all its forms and venues and

corrected.  *Al Haramain Islamic Found., Inc. v. United States Dep't of Treasury*, 686 F.3d 965,

985–88 (9th Cir. 2012).

       This order provides only a post-deprivation remedy, to be sure, but post-deprivation

remedies are efficacious, especially where, as here, it would be impractical and harmful to national

security to routinely provide a pre-deprivation opportunity to be heard of the broad and universal

type urged by plaintiff's counsel.  *Haig v. Agee*, 453 U.S. 280, 309–10 (1981).  Such advance

notice to all nominees would aid terrorists in their plans to bomb and kill Americans.  Moreover, at

the time of listing, the government would have no way of knowing which nonimmigrant aliens

living abroad would enjoy standing under *Ibrahim II*.  Instead, any remedy must await the time

when, if ever, concrete, reviewable adverse action is taken against the nominee.

       Put differently, until concrete, reviewable adverse action occurs against a nominee, the

Executive Branch must be free to maintain its watchlists in secret, just as federal agents must be

able to maintain in secret its investigations into organized crime, drug trafficking organizations,

prostitution, child-pornography rings, and so forth.  To publicize such investigative details would

ruin them.  Once concrete, reviewable adverse action is taken against a target, then there is and

**United States District Court**
For the Northern District of California

1    will be time enough to determine what post-deprivation process is due the individual affected.  In

2    this connection, since the reasonable suspicion standard is an internal guideline used within the

3    Executive Branch for watchlisting and not imposed by statute (or by specific judicial holding), the

4    Executive Branch is free to modify its own standard as needed by exception, even if the exception

5    is cloaked in state secrets.  Any other rule requiring reviewability before concrete adverse action

6    would be manifestly unworkable.[*]

7        Given the Kafkaesque on-off-on-list treatment imposed on Dr. Ibrahim, the government is

8    further ordered expressly to tell Dr. Ibrahim that she is no longer on the no-fly list and has not

9    been on it since 2005 (always subject, of course, to future developments and evidence that might

10   warrant reinstating her to the list).  This relief is appropriate and warranted because of the

11   confusion generated by the government's own mistake and the very real misapprehension on her

12   part that the later visa denials are traceable to her erroneous 2004 placement on the no-fly list,

13   suggesting (reasonably from her viewpoint) that she somehow remains on the no-fly list.

14       It is true, as the government asserts as part of its ripeness position, that she cannot fly to the

15   United States without a visa, but she is entitled to try to solve one hurdle at a time and perhaps the

16   day will come when all hurdles are cleared and she can fly back to our country.  The government's

17   legitimate interest in keeping secret the composition of the no-fly list should yield, on the facts of

18   this case, to a particularized remedy isolated by this order only to someone even the government

19   concludes poses no threat to the United States.  Everyone else in this case knows it.  As a matter of

20   remedy, she should be told that the no-fly hurdle has been cleared.

21                            *                    *                    *

22

23       * In the instant case, the nomination in 2004 to the no-fly list was conceded at trial to have been a
     mistake.  In this sense, this is an easier case to resolve.  Harder no-fly cases surely exist.  For example, the
24   government uses "derogatory" information to place individuals on the no-fly list.  When an individual is refused
     boarding, does he or she have a right to know the specific information that led to the listing?  Certainly in some
25   (but not all) cases, providing the specifics would reveal sources and methods used in our counterterrorism
     defense program and disclosure would unreasonably jeopardize our national security.  Possibly, instead, a
26   general summary might provide a degree of due process, allowing the nominee an opportunity to refute the
     charge.  Or, agents might interview the nominee in such a way as to address the points of concern without
27   revealing the specifics.  Possibly (or possibly not), even that much process would betray our defense systems to
     our enemies.  This order need not and does not reach this tougher, broader issue, for, again, the listing of Dr.
28   Ibrahim was concededly based on human error.  Revealing this error could not and has not betrayed any
     worthwhile methods or sources.

                                                          30

United States District Court
For the Northern District of California

No relief granted herein implicates state secrets. The foregoing relief does nothing more than order the government to delete or to correct in all its agency systems any ongoing effects of its own admitted inexcusable error and reconfirm what she was told in 2005, namely that she is *not* on the no-fly list. The government has no defense, classified or not, against their conceded error in 2004. In complying with this relief, the government will not have to reveal any classified information. It merely has to certify that it has cleansed its record of its own error and reveal to plaintiff her current no-fly list status, a non-classified item that the Department of Homeland Security itself revealed to Dr. Ibrahim in 2005.

In sum, after what our government has done by error to Dr. Ibrahim, this order holds that she is entitled to the post-deprivation remedy described above, that the government's post-deprivation administrative remedies fall far short of such relief, and to deny her such relief would deprive her of due process of law. This order will supply the due process that otherwise has been denied to plaintiff.

### THE VISA ISSUES

In December 2009, Dr. Ibrahim was informed that her visa application was denied pursuant to Section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B). The consular officer wrote the word "(Terrorist)" on the denial form. It is undisputed, moreover, that the visa refusal form did not have a check mark next to the box stating, "You are eligible to apply for a waiver on the ground(s) of ineligibility" (TX 47). It is also undisputed that the Immigration and Naturalization Act provides that nonimmigrant visa applicants may apply for a waiver of many of the grounds of visa ineligibility under 8 U.S.C. 1182(a).

The Court has read the relevant classified information, under seal and *ex parte*, that led to the visa denials. That classified information, if accurate, warranted denial of the visa under Section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B). (That information was different from the 2004 mistaken nomination by Agent Kelley.) Therefore, under the state secrets privilege, any challenge to the visa denials in 2009 and 2013 must be denied. *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080, 1086–89 (9th Cir. 2010) (en banc). In

31

United States District Court

For the Northern District of California

1   any event, denial of visas may *not* be reviewed by district courts. *Kleindienst v. Mandel*, 408 U.S.

2   753, 769–70 (1972).

3        Nonetheless, this order grants other limited relief as follows. The government must inform

4   Dr. Ibrahim of the specific subsection of Section 212(a)(3)(B) that rendered her ineligible for a

5   visa in 2009 and 2013. This is pursuant to the on-point holding of *Din v. Kerry*, 718 F.3d 856, 863

6   (9th Cir. 2013). As quoted above in the findings, subpart B has nine subsections and is lengthy.

7   The pertinent subsections should have been identified to plaintiff, according to *Din*. Doing so

8   would have assisted her in understanding the particular provision of law that barred her entry.

9   Merely citing to a lengthy collection of grounds collected together under the heading "Terrorist

10  activities" will not do under *Din*. Under the law of our circuit, this precise error is reviewable and

11  relief is warranted by the record.

12       One might wonder why, if Dr. Ibrahim herself is concededly not a threat to our national

13  security, the government would find her inadmissible under the Act. In this connection, please

14  remember that the Act includes nine ineligible categories. Some of them go beyond whether the

15  applicant herself poses a national security threat.

16       Keeping in mind the government's concession that Dr. Ibrahim herself is not a threat to the

17  United States, this order further holds that the consular officer erred in indicating that Dr. Ibrahim

18  was ineligible to *apply* for a waiver of the ground(s) for ineligibility (TX 47). This is a holding

19  separate and apart from *Din*, so the reason for reviewability will now be spelled out.

20       The Immigration and Nationality Act confers upon consular officers exclusive authority to

21  review applications for visas, precluding even the Secretary of State from controlling their

22  determinations. *See* 8 U.S.C. 1104(a), 1201(a). The powers afforded to consular officers include,

23  in particular, the granting, denying, and revoking of immigrant and non-immigrant visas. 8 U.S.C.

24  1201(a), (i). Consular officers exercise this authority subject to the eligibility requirements in the

25  statute and corresponding regulations. 22 C.F.R. 41.121–122.

26       Section 41.121 of Title 22 of the Code of Federal Regulations governs the process for

27  refusal of individual visas. It states that "[w]hen a consular officer knows or has reason to believe

28  a visa applicant is ineligible and refuses the issuance of a visa, he or she *must* inform the alien . . .

United States District Court
For the Northern District of California

1    whether there is, in law or regulations, a mechanism (*such as waiver*) to overcome the refusal"

2    (emphasis added).  Section 42.81 adds that "[t]he consular officer *shall* inform the applicant of the

3    provision of law or implementing regulation on which the [visa] refusal is based *and of any*

4    *statutory provision of law or implementing regulation under which administrative relief is*

5    *available*" (emphasis added).  The regulations governing the issuance of nonimmigrant visas do

6    not vest the consular officials with discretion on whether to follow the procedure proscribed by the

7    Code of Federal Regulations.  *See Patel v. Reno*, 134 F.3d 929, 931–32 (9th Cir. 1997) (if consular

8    official fails to render a decision in accordance with Section 42.81, courts have jurisdiction to

9    compel him to do so).

10          Here, the consular officer indicated, according to the form letter, that Dr. Ibrahim was

11   ineligible for a visa or admission into the United States under Section 212(a)(3)(B).  At trial and in

12   the post-trial briefing, the government has not argued that Dr. Ibrahim was ineligible for a waiver

13   and the trial record did not demonstrate (other than via the letter) that the consular officer ever

14   even made a determination, one way or the other, as to whether Dr. Ibrahim was eligible.  As the

15   government has conceded, however, Dr. Ibrahim posed no threat of committing an act of

16   international or domestic terrorism.  The consular officer, however, never informed Dr. Ibrahim

17   that she could apply for a waiver to be admitted to the United States temporarily.  In this Court's

18   view, Dr. Ibrahim was at least eligible to apply for a discretionary waiver.

19          The government argues that regardless of whether the consular officer made a mistake in

20   determining Dr. Ibrahim's waiver eligibility, the decision was entirely discretionary and therefore

21   not subject to judicial review.  It is true that a consular officer's discretionary decision to grant or

22   deny a visa petition is not subject to judicial review.  *See Li Hing of Hong Kong, Inc. v. Levin*, 800

23   F.2d 970, 971 (9th Cir. 1986).  On the other hand, when a claim challenges the authority of the

24   consular officer to take or fail to take an action as opposed to a decision actually taken within the

25   consular officer's discretion, limited reviewability exists.  *See Mulligan v. Schultz*, 848 F.2d 655,

26   657 (5th Cir. 1988) (judicial review is appropriate to consider a challenge to the Secretary's

27   authority to place temporal limits on processing non-preference visa applications).

28

33

United States District Court

For the Northern District of California

Limited reviewability of a consular officer's wrongful failure to advise an alien about waiver admissibility is further supported by the enabling statute. Section 1182(d)(3)(A) states that a consular official "may" grant a visa waiver "after approval by the Attorney General of a recommendation by the Secretary of State or by the consular official that the alien be admitted temporarily despite his inadmissibility." 8 U.S.C. 1182(d)(3)(A). Section 1182(d)(3)(B), on the other hand, states that the Secretary of State, after consultation with the Secretary of Homeland Security, or vice-versa, "may determine in such Secretary's *sole unreviewable discretion* that subsections (a)(3)(B) of this section shall not apply . . ." (emphasis added). A general guide to statutory construction states that the mention of one thing implies the exclusion of another, *expressio unius est exclusio alterius*. 73 Am.Jur.2d, *Statutes*, Section 211, at 405 (1974). Here, the governing statute states that the consular official "may" grant a waiver, whereas, it is in the Secretary's "sole unreviewable discretion" to decide whether the reasons for denying a visa should even apply. Accordingly, a consular officer's failure to advise an alien of her right to at least apply for a visa waiver (as the regulation mandates) is not solely within the consul's discretion and is reviewable by courts.

During trial, the Court asked Sean Cooper, the Chief of the Coordination Division in the Visa Office of the Bureau of Consular Affairs at the State Department, about the waiver procedure:

> **Court:** Does the applicant . . . get told there's such a procedure and they can apply for a waiver, or is it just done totally in-house as a secret process? How does it work?
>
> **Witness:** Normally, the alien would be informed if the inadmissibility has a waiver relief. So they could then choose to try to say, "Well, I'd like to do that." But it is then forwarded for consideration with an endorsement from the Department of State. So the Consular Officer would say, "I support this," or "I don't support this for these reasons."

Because the consular officer unlawfully failed in his duty to advise Dr. Ibrahim of her right to at least apply for a waiver, the doctrine of consular nonreviewability does not apply. Accordingly, this order holds that Dr. Ibrahim must be given an opportunity to apply for a waiver. This order, of course, does not insist that the government grant a waiver. Once acted on, the agency's decision whether (or not) to grant a waiver would presumably be unreviewable.

34

United States District Court
For the Northern District of California

OTHER CHALLENGES

Although plaintiff's counsel raise other constitutional challenges, those arguments, even if successful, would not lead to any greater relief than already ordered. It must be emphasized that the original cause of the adverse action was human error. That error was not motivated by race, religion, or ethnicity. While it is plausible that Dr. Ibrahim was interviewed in the first place on account of her roots and religion, this order does not so find, for it is unnecessary to reach the point, given that the only concrete adverse action to Dr. Ibrahim came as a result of a mistake by Agent Kelley in filling out a form and from later, classified information that separately led to the unreviewable visa denials.

If and when *reviewable*, concrete adverse action is taken by our government against Dr. Ibrahim, then we may have an occasion to adjudicate the extent to which she should be informed, at least generally, of the classified and under seal grounds for the action against her so as to give her an opportunity to rebut the derogatory information. The visa denial itself is *not* reviewable. Until reviewable, concrete adverse action occurs, there is no occasion to litigate the extent to which any information about her, derogatory or not, should reside in the government's databases — save and except for the more limited relief provided above.

PUBLIC ACCESS TO OUR COURTS

The next part of this order addresses the frustrating efforts by the government to shield its actions from public view and the extent to which this order should be made public. For the time being, all of the order shall remain secret (save and except for a brief public summary) until the court of appeals can rule on this Court's view that the entire order be opened to public view.

One of the many gifts left for us by Circuit Judge Betty Fletcher was her dedication to protecting the common law right of the public and the press to examine the work of our courts. In a decision upholding such access, Judge Fletcher wrote of the federal right to inspect and copy public records and documents. *San Jose Mercury News, Inc. v. U.S. Dist. Ct.–Northern Dist.*, 187 F.3d 1096, 1102 (9th Cir. 1999). Judge Fletcher later wrote that "[i]n this circuit, we start with a strong presumption in favor of access to court records." *Foltz v. State Farm Mutual Automobile*

35

*Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). Her decision instructed courts to "consider all relevant factors, including: the public interest in understanding the judicial process."

Thanks to Judge Fletcher, the public has a well-recognized right to access its courts. "[Judicial] records are public documents almost by definition, and the public is entitled to access by default." This presumption is strong because the public has an interest in "understanding the judicial process" as well as "keeping a watchful eye on the workings of public agencies." Public oversight of courts and therefore public access to judicial operation is foundational to the functioning of government. Without such oversight, the government can become an instrument for injustice. *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178, 1180 (9th Cir. 2006).

In stubborn resistence to letting the public and press see the details of this case, the government has made numerous motions to dismiss on various grounds, including an overbroad complete dismissal request based on state secrets. When it could not win an outright dismissal, it tried to close the trial from public view via invocation of a statutory privilege for "sensitive security information" ("SSI"), 49 U.S.C. 114(r) and 49 C.F.R. 1520.5, and the "law enforcement privilege." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). At least ten times the trial was interrupted and the public asked to leave so that such evidence could be presented.

This order recognizes the legitimacy of protecting SSI and law enforcement investigative information. On the other hand, the statute itself recognizes that information more than three years old should ordinarily be deemed too stale to protect — which is the case here. *See* Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109–295, Section 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006).

Significantly, virtually all of the SSI about the workings of the TSDB and its allied complex of databases, including the no-fly list, is publicly known. For example, after a 2006 GAO report revealed that half of the tens of thousands of potential matches sent to the TSDB between December 2003 to January 2006 were misidentifications, the Department of Justice published a September 2007 audit report which revealed astonishing results (TX 102):

- Of the 105 records reviewed in the audit, 38% contained errors or inconsistencies that were not identified through the TSC's "quality assurance efforts."

- Around 2007, the TSDB increased by average of over 20,000 records per month.

36

United States District Court<br>For the Northern District of California

1

2

3

4

5

6

- When the TSC began its review of the no-fly list in July 2006, there were 71,872 records. When the review was completed in January 2007, the government determined that the no-fly list should be reduced to 34,230 records.

- TSC redress complaint data showed that 13% of the 388 redress inquiries closed between January 2005 and February 2007 were for complainants who were misidentified and were not an actual watchlist subject. A remarkable 20% necessitated removing the complainant's identity from the watchlist. The TSC determined that 45% of the watchlist records related to redress complaints were inaccurate, incomplete, not current, or incorrectly included.

7   An October 2007 GAO report detailed the process by which "encounters" with individuals

8   on a terrorist watchlist are resolved, discussing the "reasonable suspicion" standard, described the

9   nomination process to the TSC's watchlists, and charted the rapid growth of watchlist records.

10   This 84-page report describes a number of watchlists and even indicates vulnerabilities with the

11   system (TX 238).

12   A March 2010 congressional hearing involved testimony and statements from government

13   officials, including the Director of the TSC, Timothy J. Healy, wherein the TSDB, CLASS, TECS,

14   no-fly and selectee lists were discussed in some detail (TX 250). *See* Sharing and Analyzing

15   Information to Prevent Terrorism, 111th Cong. 116 (2010). A May 2012 GAO report addressed

16   weaknesses in the watchlist nomination process exposed in the wake of the 2009 attempted attack

17   (TX 251).

18   In short, public release of this entire order will reveal very little, if any, information about

19   the workings of our watchlists not already in the public domain. Public release would reveal no

20   classified information whatsoever.

21   This order has been drafted so as to address all issues without revealing any classified

22   information. With respect to SSI and law enforcement information, this order holds that the

23   information revealed herein is too stale to warrant protection from public view. *See* Section

24   525(a)(2), 120 Stat. 1355, 1382. Therefore, this entire order will be made public. This aspect of

25   the order, however, will be **STAYED UNTIL NOON ON APRIL 15, 2014**, in order to give defendants

26   an opportunity to seek a further stay thereof from the court of appeals; meanwhile, the entire order

27   shall be **UNDER SEAL** (and a short summary will meanwhile be released by the judge for public

28

37

view).  Barring an order from higher authorities, this entire order will be made public at NOON ON APRIL 15, 2014.

## CONCLUSION

The following relief is hereby ordered:

A.     The government shall search and trace all of its terrorist watchlists and records, including the TSDB, TIDE, KSTF, CLASS, TECS, IBIS, TUSCAN, TACTICS, and the no-fly and selectee lists, for entries identifying Dr. Ibrahim.  The government shall remove all references to the mistaken designations by Agent Kelley in 2004 and/or add a correction in the same paragraph that said designations were erroneous and should not be relied upon for any purpose.  Declarations signed under oath by appropriate government officials shall be filed no later than NOON ON APRIL 15, 2014.  The declarations shall certify that the government has searched, cleansed, and/or corrected in the same paragraph all entries identifying Dr. Ibrahim and the mistaken 2004 designations.  Each declaration shall specifically detail the steps and actions taken with respect to each watchlist.

B.     The government must inform Dr. Ibrahim of the specific subsection of Section 212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B), that rendered her ineligible for a visa in 2009 and 2013.

C.     The government must inform Dr. Ibrahim that she is no longer on the no-fly list and has not been on it since 2005.

D.     The government must inform Dr. Ibrahim that she is eligible to at least apply for a discretionary waiver under 8 U.S.C. 1182(d) and 22 C.F.R. 41.121(b)(1).

E.     All of the foregoing must be done by APRIL 15, 2014.

**IT IS SO ORDERED.**

Dated:   January 14, 2014.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE